Burks, J.,
delivered the opinion of the court.
This is the sequel of the case of Sexton v. Crockett and others reported in 23 Gratt. 857, et seq., where a statement of the case by the reporter, as it then stood, may be seen. After the case had been reached again the circuit court of Wythe county, to which it was remanded by the decree of this court, it was duly revived against the heirs of Robert I. Crockett, pursuant to said decree, and Joseph W. Caldwell, the commissioner who made sale of the Wytheville hotel property under a former decree, filed a report supplemental to his former report of the sale, to *which supplemental report S. S. Crockett, a defendant in the cause, and the pttrehaser of the property at the sale, filed exceptions; and the heirs of Robert I. Crockett (defendants) and David Sexton, and Laurence, Myers & Co. (complainants) united in exceptions to the confirmation of the sale. By the last mentioned exceptions, the exceptors objected to the sale “unless it should be confirmed upon the express condition that the purchaser, S. ■S. Crockett, should pay the sum of ten thousand dollars in money lawful then (the date of the exceptions) to be received in payment of debts.”
The cause came on to be heard the 13th of March, 1875, on the papers formerly read, the decree aforesaid of the court, the said supplemental report of Commissioner Caldwell and the exceptions aforesaid, and the court pronounced its decree declaring its opinion that the said supplemental report was properly filed; that the said sale was for good money and not for Confederate money; and. in that view, considering the heirs of Robert I. Crockett, David Sexton, and Laurence. Myers & Co., as making no objections to the sale, overruling the exceptions of S. S. Crockett, and decreed that the sale was for $10,000 in good money, payable as in the proceedings mentioned, and that said sale be confirmed, and sanctioning as valid the payment by S. S. Crockett of Confederate States treasury notes to such of the creditors as accepted them in satisfaction of their respective debts, but holding that the said David Sexton and Laurence, Myers & Co. had never accepted nor agreed to accept such notes in payment of their respective debts, and that said debts, with the costs of these parties in the circuit court and in this court, remained wholly unpaid, further decreed that unless payment thereof be made within thirty days, the said Wytheville hotel property should be rented out and payment be made out of the *rents, &c. The case is now before this court on an ap *356 peal allowed to the said S. S. Crockett from this decree.
The first assignment of error is in these words:
“1st Error. The court should have simply, after R. I Crockett’s heirs were before the court, reaffirmed the decrees of the 13th May, 1863, and of 10th October. 1863, as your appellate court, ‘without therefore deciding any other question in the case,’ ordered a reversal of cause for want of R. I. Crockett’s heirs as parties, and directed said circuit court to proceed ‘in accordance to the principles herein above declared.’ But said court of its own accord, and not by direction of appellate court, overturns and disturbs on their merits, the said two decrees of ten years’ standing, and that too in the face of Commissioner Caldwell’s reports and the decrees of the court of the year 1863. It was manifestly contrary to the law and evidence of the case.”
The objection intended to be presented by this assignment, as would seem from its terms, and as I understand from the argument of counsel, is, that the circuit court misunderstood and misconstrued the meaning and effect of the. decree of this court reversing and annulling the decrees of the l3th of May,-1863, and 'the 10th of October. 1863; that the only purpose and effect of that decree was to reverse and annul said decrees of the circuit court so far only as to require the heirs of Robert I. Crockett to be made parties, and as soon as that was done, that said decrees should be reaffirmed, and that no other nor different decrees should be rendered.
This, I think, is a total misconception of the meaning and legal'effect of the decree of this court. Robert I. Crockett was owner in common with S. S. Crockett of *the property ordered to be sold. He was a defendant in the cause and a necessary party. He died before the sale. His title descended to his heirs, and they thus had the same interest in the property that he had. They were necessary parties, therefore, and should have been before the court in any further proceedings to be had. No decree of the court could bind them or prejudice their rights without an opportunity given them of being- heard. In their absence, the court had ordered a sale of their property, made and confirmed it, collected the purchase money and disbursed it, had ordered and caused to be made to the purchaser a deed of conveyance of their property, and had actually made final disposition of the cause by striking it from the docket. This court, by its decree, wholly reversed and annulled the decrees under which these proceedings were had. They were not partially reversed. They were whoíly swept away.
By an inspection of the decree, it will be seen that this court decided: First. “That the circuit court erred in confirming the sale of the real estate in the proceedings mentioned, distributing the proceeds thereof, and striking the case from the docket without having before it all the heirs-at-law of Robert I. Crockett, dec’d.” Second. That “the heirs aforesaid should now be brought before the court by proper proceedings and allowed the privilege of resisting or assenting to the confirmation of the sale aforesaid before any action shall be had thereon.” The decree then proceeds: “Without therefore deciding any other question in this case,” (that is, any other than those questions already decided, to-wit: first, that the circuit court had erred in the particulars before stated, which embraced the whole of the decrees of the 13th of May and the 10th of October, 1863, and second, that the heirs of Robert I. Crockett should be brought before the court and allowed the privilege of resisting or assenting to the ^confirmation of the sale before any action be had thereon,) “it is decreed and ordered that the decree of the 13th May, 1863, confirming the sale of the real estate in the proceedings mentioned, and disposing of the proceeds, and the decree of the 10th day of October, 1863, finally disposing of the case and striking it from the docket, be reversed and annulled,” &c. * * * “It is further ordered that this cause be remanded to the said circuit court of Wythe county, to be further proceeded in according to the principles hereinabove declared.” What “principles above declared?” Why plainly, that the decrees rendered in the absence of the heirs were for that reasons wholly erroneous, and were therefore wholly reversed and annulled, and that said heirs should now be brought before the court and be allowed the privilege of resisting or assenting to the confirmation of the sale before any action be had thereon; that is, that they shall not only be brought before the court, but when they get there they shall stand as if the decrees of the 13th of May and the 10th of October, 1863, had never been rendered. So far therefore from their being precluding from resisting the confirmation of the sale, they were expressly allowed to resist it, and they had the right to do so upon any grounds which would have been admissible at the time the decree of the 13th of May was pronounced had they then been parties. They did resist it, and objected to its confirmation unless by the confirmation the purchaser should be held liable for the. purchase price of the property in good money. This objection and exception of the heirs necessarily presented for decision the question, whether the sale had been made for Confederate currency or for lawful money; if for the former, the court had nothing to do but by further decree to affirm what had already been done; if for the latter, it had to provide for the collection and disbursement of .such money as the ^purchaser had contracted to pay, except so far as Confederate currency had been paid by the purchaser and accepted by the creditors in satisfaction of their debts.
The second, third and fourth assignments of error are based on the refusal of the court to sustain the appellant’s three exceptions to- Commissioner Caldwell’s supplemental report. The first two are easily disposed of. *357 Exception No. 1 is, because, as alleged, the report is incomplete in not showing the amount of money received by the commissioner from the appellant; and No. 2, because the report is further incomplete in not showing what disposition the commissioner made of the money so received. Both exceptions are fully and satisfactorily met and answered by the original report of the commissioner and statement therewith filed, together with exhibit “X,” filed with (he appellant’s third exception. These papers, a part of the record, show fully and accurately all the money collected by the commissioner and the disposition made of it.
Exception No. 3 presents more difficulty. Tt is an objection to the confirmation of the report, unless the appellant “be held and recognized as having fully paid the purchase money, $10,000. the amount of his bid for the property, as per commissioner’s original report, and further, that there is no liability on him for any of the debts enumerated in said report, among which is the judgment of David Sexton for $1,088, and that the issue should be one between the commissioner and said Sexton’s debt.”
This exception is substantially to the confirmation of the sale, unless held to be for Confederate currency, and is the converse of the exception filed by the heirs of Robert T. Crockett, the two exceptions of the respective parties presenting for determination the main question in this case, to-wit: whether the sale was made for lawful *money. or for Confederate States treasury notes, or with reference to such notes as a standard of value. This question must be determined by the evidence in (he case, of which Commissioner Caldwell’s supplemental report, relied on by the appellees, is a most important part. This report is objected to by the appellant, and his objection is embodied in his fifth assignment of errors, which is in these words: “Said report (supplemental) was not ordered by either appellate or circuit court, nor asked for by any party to the suit, but was voluntary on the part of the commissioner, and should not have been received or considered.”
A commissioner appointed by decree of court to make sale of property, is an officer and special agent of the court, and his powers and duties are conferred and imposed solely by the decrees and orders under which he acts, file is required, among other things, to make report of his proceedings under (he decree by which he is appointed to the court from which he derives his authority, as a basis for the further action of the court. If his report be incomplete, insufficient, or in any way imperfect, he may be required to make a further report; and so, I apprehend, if, after he has made his report, and it has been received and accepted, at any time before final action upon it, he discovered any material mistake, or omission, or ambiguity in it, he may, by leave of the court, and it would be his duty, to file an amended, additional or supplemental report, correcting the mistake, supplying the omission or explaining the ambiguity. Such is the common practice, and it seems convenient, conducive to justice and free from objection. These reports are filed with the papers in the cause, become a part of the record, and are open to inspection, examination and exception by all the parties.
*After the decrees of May and October, 1863, had been reversed and annulled by this court, the heirs of Robert I. Crockett were made parties, and had the liberty, under the express directions of the decree of this court, to file exceptions, if so advised, to the sale made by Commissioner Caldwell and his report thereof. They accordingly filed such exceptions, which raised directly the question whether the sale was made for lawful money or Confederate currency, or with reference to such currency as a standard of value. In the report excepted to, the commissioner had merely slated that the appellant had bid $10,000 for the property, and that being the only bid. the property was knocked down to him at that price. He did not slate for what kind of money or currency the property was sold, nor any of the particulars of the bidding and sale.
The supplemental report filed by him was intended, it would seem, to supply the omissions in his former report, not to contradict it, and to furnish to the court and the parties such additional facts that came to his knowledge in the discharge of his official duties, as were deemed by him material in considering the questions arising upon the exceptions. I can see no objection to this. The court might have required such additional report for its own information and guidance, and although there seems to have been no order, at least none in the record, for such report, yet the court received it when tendered as if it had been ordered, and approved and _acted upon it, no exception being filed by any party to its reception, and none of the statements contained in it. These statements, if they had been denied, might and doubtless would have been proved by taking the deposition of the commissioner and perhaps by other evidence. The objection, made here for the first time, comes too late. The exceptions filed did not raise it. Exceptions to a master’s ^report are said to be in the nature of special demurrers, and the party objecting must point cut the error; otherwise the part not excepted to will be taken to be admitted. 2 Dan. Ch. Prac. (4th American ed’n), 1316, note 4, and cases there cited. The same principle would seem to apply to all reports of officers made in a chancery cause, at least to such a report as the one now being considered. Tn all cases, I take it, where exceptions are necessary at all, (hey should specify with reasonable certainty the particular grounds of objection, so as to enable the opposing party to see clearly what he has to meet, and the court what it has to decide.
Considering this report, then, as evidence, *358 it would seem well nigh conclusive of the prime question in this cause.
In his report, the commissioner says:
“Said sale was pretty, largely attended by. persons seeming tó contemplate bidding', for said property. The sale was in progress at the door of the hotel, on Main street. Mr. S. Sr Crockett bid $10;000, and the sale started with this bid. After it had been cried once or twice Mr. Jos. Cloyd Mc-Gavock, from the crowd of bystanders, called out to your commissioner that there were several persons desiring to be bidders, who, before bidding, wished to know whether the price could be paid in Confederate currency. Your commissioner thereupon mounted the horse-block near by, and proclaimed 'that he would not undertake to say in what currency payment would have to be made or would be received; that the decree of sale was silent on the subject and directed merely a sale for money generally; that, perhaps, the court might choose to receive a payment in currency, but the purchaser must risk that.’ After this the sale proceeded, but- no more bids were made, and the crowd *having mostly dispersed, the property was knocked down to S. S. Crockett, and the other proceedings were had which have been already reported. Mr. Crockett understood his purchase to be for lawful money, and not for Confederate money, as your commissioner understood from him at the time, and has since so declared in his answer to a bill exhibited against him in this court by R. I. Crockett’s administrator, in which answer he says, in reference to said decree to sell and said sale: ‘In pursuance whereof, on the 9th February, 1863, such sale was made at.public auction to respondent for the sum of $10,000 in lawful money, and not in Confederate money, and was reported and confirmed at the May term of the court next following.’
“Your commissioner understood said sale to be for good money, otherwise he. should have reported that it should not be confirmed^ He thought and thinks $10,000 in good money a fair price for the property at that time, and the same sum in Confederate money grossly inadequate.”
There is other evidence besides this report, which tends strongly to show that the sale was not for Confederate States treasury notes, nor made with reference to such notes as a standard of value. The price at which the property sold was not more than it was worth in a sound currency in ordinary times. It was proved in 1860, that its annual rental value, according to the estimate of different witnesses, was from $1,000 to $1,800. The decree for sale was made on the 13th day of October, 1860. It was first offered for sale under that decree on the 32th day of March, 1861. and was purchased by Robert Gibboney and William Gibboney, at the price of $8,400. The sale was excepted to by the complainants and also by S. S. Crockett (the appellant here) and ^Robert I. Crockett. The first exception of the Crocketts is in these words:
“Because it (the property) sold for a grossly inadequate price and at a ruinous sacrifice, the price for which it sold being only $8,400.” The other two exceptions are evidently grounded, on the first. The sale was set aside, and two years afterwards, and when the property had undergone repairs, it was bought by the appellant at an advance of $1,600 on the price bid at the first sale, which was, indisputably, a sale made for gold, or its equivalent, and pronounced by the appellant to have been “for a grossly inadequate price and at a ruinous” sacrifice.”
The main reliance of the appellant is upon the presumption arising from the consent of the parties to a sale given in the decree of the 11th of October, 1862. Certainly this fact deserves consideration, and if it stood alone, would be sufficient perhaps to warrant the0 conclusion that the sale which af-terwards took place in 1863, was made either for Confederate currency, or with reference to such currency as a standard of value. It has been held by this court that it will take judicial notice of the fact, that in 1863 the only currency in circulation in this state was Confederate States treasury notes, and that decrees for sales of property, as late as 1863, and judicial sales under such decrees, must be taken, unless the contrary plainly appears to have been rendered and make for the currency which then constituted the only circulating medium of the country. Walker’s ex’or & als. v. Page & als., 21 Gratt. 636; Poague v. Greenlee’s adm'r & als.. 22 Gratt. 724.
The question, however, is at last, one of intention, or, in the language of the statute, “what was the true understanding and agreement, express or to be implied, of the parties;” and the presumption based upon the date of the decrees and the time of sale therunder. is one. not of *law, but of fact, not conclusive, but prima facie only, and therefore susceptible, as other like presumptions, of being repelled by any evidence which convinces the mind that it is not well founded in the particular case.
In this case the decree for sale was made in October, 1860, and', must, therefore, be taken to have been then intended to be for a sound currency. The attempted sale under that decree, in March, 1861, must have been intended to be for a like currency; and in the decree of October, 1862, it is worthy of notice, that the consent of the parties was, and the order of the court was, “to carry into effect said decree of October term, 1860, so far as the same orders a sale of the property therein mentioned, in the manner and on the terms therein prescribed,” &c. The price which the property brought was not greater than the value of the property on the day of sale, in a sound currency; not a great deal more than the price bid for it at the first sale two years before, when the appellant, who became the purchaser at the last sale, excepted to the first, because it was “for a grossly inadequate price and at a ruinous sacrifice.” The sale was not for cash, nor for any part of the price in cash, but wholly on a credit, *359 and a long credit of one, two and three years, for equal instalments of the purchase money, carrying interest from the day of sale. '1 he “true understanding and agreement” of the parties immediately contracting, the commissioner who made the sale on behalf of the court and the purchaser who bought, was, that the sale was not made for Confederate States treasury notes, nor with reference to such notes as a standard of value, but for lawful money. The purchaser admitted this on the day of sale, and after-wards in solemn form in his answer to a bill in chancery.
*Nor is there any evidence that the appellee. Davis Sexton, ever consented to the collection of the purchase money from the appellant in Confederate currency. The contrary is rather to be inferred; for the commissioner reported that he refused to take this currency for his debt. At what precise time the tender was made does not appear. It may be that the appellant ascertained, after the sale, that most of ihe creditors would accept Confederate currency in satisfaction of their debts, but that some would not; and this may account for his haste in offering to make payment before. the purchase money became due. At all events, it distinctly appears by the decree of May, 1863, that it was in deference to his wishes that the commissioner was empowered to collect the whole of the purchase money, at once and in advance, in Confederate Slates treasury notes; and there must have been some intimation or apprehension, that perhaps some of the creditors would refuse to receive these notes, and this may serve to account for the extraordinary proposition made beforehand for investment of the notes in Confederate bonds, in case of refusal by any creditor to receive them. A creditor might have been constrained perhaps to accept a -war currency rather than hazard war securities. The notes- invested were the property of the appellant. After the refusal of Sexton to receive them, he might, by order of the court, obtained for that 'purpose, have had them paid back to him, or, after investment, had the securities delivered to him. He either neglected or refused to have this done, and he must bear the loss.
In the last assignment of error there is no merit. Laurence, Myers & Co., were nonresidents, and they at least consented to nothing. The voluntary payment by the commissioner of the nominal amount of their gold debt in Confederate States treasury notes to the ^sequestration receiver of the Confederate States was no bar to their claim. The notes thus paid were no more the property of Laurence, Myers & Co., than the notes invested in Confederate bonds were the property of David Sexton. In both instances they perished the property of the appellant.
Looking at the whole case, I am of opinion there is no error in the decree of the circuit court, and that it should be affirmed.
Decree affirmed.